# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**SOUTHWEST CARPENTERS
PENSION TRUST, on behalf of
itself and others similarly situated,**

**Plaintiff,**

**v.**                                          **Case No. 06-C-349**

**MERGE TECHNOLOGIES, INC.
(d.b.a. MERGE HEALTHCARE),
RICHARD A. LINDEN, SCOTT T. VEECH,
DAVID NOSHAY, and KPMG LLP,**

**Defendants.**

---

# DECISION AND ORDER

---

The Lead Plaintiff in this putative class action, Southwest Carpenters Pension Trust

("SWC" or the "Plaintiff"), alleges that Merge Technologies, Inc. ("Merge"), Richard

Linden, Scott Veech, David Noshay, and KPMG LLP ("KPMG") violated §§ 10(b) and 20(a)

of the Securities and Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §78j(b) and

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Each of the Defendants filed a motion to dismiss,

all of which are currently pending before the Court.

# BACKGROUND[1]

## I.    The Parties

Merge is headquartered in Milwaukee, Wisconsin, and engages in the development and delivery of medical imaging and information management software and services. Richard Linden ("Linden") served as Merge's Chief Executive Officer ("CEO"), Scott Veech ("Veech") served as Merge's Chief Financial Officer ("CFO"), and David Noshay ("Noshay") served as Merge's Senior Vice President of Strategic Development during the relevant time period (collectively the "individual Defendants").    KPMG was Merge's independent auditor.

## II.    General Overview of Allegations

This security fraud action is brought on behalf of all persons who purchased the publicly traded securities of Merge between April 25, 2002 and July 3, 2006 (the "Class Period.").[2] The Plaintiff claims that during the Class Period, the Defendants engaged in a massive accounting fraud designed to ensure that Merge consistently met or exceeded

---

[1] The Background is taken from the amended Class Action Complaint ("CAC").  For purposes of deciding a motion to dismiss, the Court must accept all of the allegations in the CAC as true.  *See Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 127 S.Ct. 2499, 2509 (2007).

[2] The Defendants argue that the Lead Plaintiff lacks standing regarding statements made after SWC last purchased shares of Merge on February 7, 2006.  The defendants are wrong.  Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), the Court consolidated related actions and appointed SWC as the Lead Plaintiff to represent *all* purchasers of Merge stock during the Class Period. *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("[A]ny requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff – namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole.")

2

analysts' earnings estimates. The fraudulent accounting techniques, according to the Plaintiff, resulted in a material overstatement of Merge's net income that caused the price of Merge's stock to increase. In April 2002, Merge common stock traded in a range of between $7 to $8 per share. By February 2006, the price surged to over $27 a share, an increase of 285%. After the accounting improprieties were made public, Merge stocked plummeted to a range of $3 to $4 per share when the amended Class Action Complaint ("CAC") was filed.

The Plaintiff alleges that the Defendants engaged in several manipulative practices that allowed Merge to improperly recognize revenues, specifically: (1) the Defendants purportedly entered into secret side agreements with its customers that reflected the contingent nature of sales contracts in order to prematurely recognize revenue; (2) the Defendants allegedly recognized revenue on products that were shipped to customers who never ordered the products; (3) the Defendants supposedly recognized revenue for products that plainly did not meet their customers' specifications; (4) the Defendants purportedly recognized revenue prior to shipping all the products that were included in the customer's contract; and (5) the Defendants allegedly recognized revenue on products it shipped to its customers free of charge.

III.   Specific Allegations

A.   Purported "Secret Side Agreements"

According to the CAC, Merge's sales representatives were required to use standardized form contracts when making sales agreements. Oftentimes, the customer would

3

request different terms from those set forth in the standardized contract, and in those cases, Linden and Veech would personally modify the form contract. In the event that a customer insisted upon certain terms that would somehow delay the recognition of revenue, Linden and Veech would allegedly negotiate "side agreements" with the customer and continue to recognize revenue as if the side agreement did not exist.

For example, Radiology Associates of Venice Florida ("RAV") began negotiations in 2004 with Merge to purchase one of Merge's products. Linden and Veech wanted the contract signed during the third quarter. As the end of the third quarter approached, RAV's representative requested that any contract be contingent upon its Board's approval. Rather than placing the contingency in the contract, Linden had a side letter drafted reflecting the contingent nature of the sales contract. Linden purportedly had RAV's representative fax the side agreement to the home fax machine of Merge's sale representative rather than his place of work. Accordingly, Merge was allowed to recognize the revenue of that sale in the third quarter, even though the sale was not finalized until the fourth quarter.

Out-Patient Imaging and Speciality Imaging ("Imaging") allegedly entered into a similar arrangement with Merge. Imaging's sales contracts were likewise contingent upon approval of their Board of Directors. Merge did not allow the contingency to be placed in the actual contract, but rather entered into side agreements with Imaging. In at least one instance, Imaging's Board of Directors ultimately did not approve a sales contract, but Merge had already recognized the contract's revenue.

4

According to the CAC, similar side agreements were entered into when sales representatives promised functionality that was not currently available in Merge's software. The side agreements were kept separate from the actual contract and not faxed to Merge's offices. The Plaintiff alleges that these side agreements were "routinely utilized" by the Defendants.

### B. Shipping Products to Customers Who Never Ordered Them

The CAC also avers that Linden instructed sales representatives to ship software before the end of a quarter, even if the customer had not signed an agreement to purchase the product. For example, in 2002, a sales representative was negotiating a potential sale with St. John's Hospital in Springfield, Missouri. The sales representative told the hospital's representative that it was important to Merge that any sale be completed at the end of the second quarter of 2002 (June 2002) for revenue recognition purposes. The hospital's representative explained that the person authorized to order products was on vacation and would not be back until after July 1, 2002, so it would not be able to submit an order during the second quarter. Nevertheless, Linden purportedly directed that $100,000 to $150,000 worth of products be shipped to St. John's Hospital without a purchase order in June 2002 so as to record additional revenue during the second quarter.

### C. Products That Did Not Meet Customers' Specifications

The Plaintiff further alleges that the Defendants recognized revenue "many times" on a sale of products that did not meet their customers' specifications. For example, upon

shipping software to RAV, the Defendants allegedly recognized all of the revenue with the contract, even though it took more than six months to implement the software. A confidential witness, CW2, who is the former Vice President of Direct Sales, explained that the Defendants "prematurely recognized revenue associated with virtually every one of Merge Technologies' contracts, notwithstanding long delays in the implementations of the software." (CAC ¶ 75.)

       D.    <u>Damaged, Used, or Incorrect Products</u>

Merge also purportedly recognized revenue by shipping damaged, used or incorrect products. For example, a confidential witness, CW 20, who was a shipping and receiving clerk, learned that Merge shipped Beverly Hospital a used print server rather than the products that it ordered. When CW20 inquired why Merge sent its customer a used print server, he discovered that Linden apparently directed an employee to "ship whatever they had in stock" so as "to make their numbers." (*Id*. at ¶ 76.)

In addition, another confidential witness CW 10, who held various senior level accounting positions with Merge, reports that the Defendants were so "frantic" to meet revenue projections at the end of a quarter that senior management would often instruct the shipping department to ship boxes to customers on the very day that a contract was signed. Those boxes, according to CW10, did not always contain the products ordered by the customer and, in some instances, did not contain any product at all. Rather, if the proper products were not ready to be shipped, the shipping department would send empty boxes and

6

damaged products to customers at the end of a quarter to inflate revenue numbers for the quarter. CW 15, a former Vice President of Sales and Vice President of Business Development, also makes the same allegations as CW10.

IV.  Public Revelations

On February 24, 2006, Merge announced that it would delay the issuance of its financial results for the fourth quarter of 2005 "in order to allow additional time to complete the audit of the Company's financial statements." Linden stated during a conference call on that same day that "the complexities of accounting for certain large sales contracts signed in the fourth quarter have delayed our ability to complete the audit." In response, the price of Merge stock fell from $24.50 per share to $20.50 per share.

Less than a month later, on March 17, 2006, Merge announced that it needed to delay the issuance of its Annual Report on Form 10-K for 2005 due to "revenue recognition and tax accounting matters relating to the merger of the Company and Cedara Software Corp. in June 2005." Merge also reported that it initiated an internal investigation into anonymous complaints that the Board of Directors received related to Merge's accounting and that its previously issued financial statements for the second and third quarters of 2005 should no longer be relied upon. The price of Merge stock fell further, this time from $17.97 per share to $15.85 per share.

7

On May 16, 2006, Linden resigned. On the same day, Merge announced that it found another error with respect to the recognition of $1 million in revenue associated with a sales contract entered into in the second quarter of 2005.

On July 3, 2006, Veech and Noshay resigned. Merge also announced on that day that its Audit Committee determined that, because of improper accounting and financial reporting practices, the previously issued financial statements for each of the reporting periods in 2002 through 2005 should no longer be relied upon. Furthermore, Merge announced that the audit reports of KPMG with respect to those financial statements ought not to be relied upon either. In response, the price of Merge stock declined from $12.31 per share to $7.30 per share.

On August 29, 2006, Merge filed its Form 10-K for 2005 with the SEC (the "2005 Form 10-K" or the "Restatement"). The 2005 Form 10-K reported that Merge's financial statements were misstated in 2002, 2003, 2004, and the first nine months of 2005 due to the following:

- Delivery of certain software products to end-user customers that did not fully meet the functionality that we believe our customers expected based on express representations we made to our customers or implied representations that arose from our demonstrations of the software products during the sales process;

- Collectibility was not reasonably assured at the time certain revenue was recognized. Some of our contracts failed to reflect contingencies expressly demanded by the customer;

- Recording revenue prior to shipment of the correct products included in a customer's contract;

8

- Recording of revenue prior to shipment of all software products included in a customer's contract. Since we did not have vendor specific objective evidence of fair value for the undelivered software element of certain of our contracts, we were required to defer all revenue for certain customer orders with partial software product shipment until delivery of all software products occurred;

- For certain customers' contracts, we were unable to establish vendor specific objective evidence of fair value of maintenance. We have deferred the related contract value and are recognizing revenue ratably over the related maintenance period; and

- We determined that we failed to reduce net sales attributable to a contract although we had agreed to provide the customer with additional software at no additional cost to the customer.

(*Id*. at ¶¶ 87-88.)

In addition, Merge stated that it "understated income tax expense, income tax payable and goodwill for the quarter ended, and as of, June 30, 2005, due to a failure to record additional tax liability and income tax expense in connection with [Merge's] June 2005 business combination with Cedara Software Corp." (*Id*. at ¶¶ 88, 182.)

Merge's Restatement also reported that "certain former members of senior management" were responsible for the misstatements. Specifically, Merge's internal investigation found that:

[C]ertain former members of senior management did not set a proper ethical tone within our organization and instill an attitude of control compliance. Certain former members of our management were directly involved in circumventing our accounting controls, and other former members of our management were aware, or should have been aware, that such controls were being circumvented. This deficiency contributed to material misstatements in our interim consolidated financial statements . . . .

9

(*Id*. at ¶ 89.)

As a result of these improprieties, Merge reported that it overstated its pre-tax and net income by more than 30% in 2002. In 2003, it overstated its pre-tax and net income by more than 115% and 40% respectively, and in 2004, it overstated its pre-tax and net income by more than 912% and 240% respectively. In addition, in the first quarter of 2005 Merge overstated its income by 1169%, in the second quarter of 2005 it understated its income by 22%, and in the third quarter of 2005 it understated its income by 15%. (*Id*. at ¶¶ 92-93.)

## DISCUSSION

I. <u>Applicable Legal Standards</u>

Section 10(b) prohibits the "use . . . in connection with the purchase or sale of any security . . . of any manipulative or deceptive device or contrivance." The SEC implemented § 10(b) by issuing Rule 10b-5, that makes it unlawful:

> (a)    To employ any device, scheme, or artifice to defraud,
> (b)    To make any untrue statement of material fact necessary in order to make the statement made . . . not misleading, or
> (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

To plead a violation of these provisions, a plaintiff must allege facts that the defendant (1) made a material false statement or omission (2) with scienter (3) in connection with the purchase or sale of securities (4) upon which the plaintiff justifiably relied and (5) that the false statement or omission proximately caused damages. *See Makor Issues & Rights, Ltd.*

10

*v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), *vacated and remanded on other grounds*, 127 S.Ct. 2499 (2007).

The Court will consider each of the Defendants' motions to dismiss separately.

II.    Richard Linden & Merge

Linden served as Merge's President and CEO from September 2000 until he resigned in May 2006. During this time, he also served as Chairman of Merge's Executive Committee, and he was a member of the Board of Directors. While Merge admits that its financial statements of 2002, 2003, 2004, and the first nine months of 2005 were materially false in its Restatement,[3] Linden argues that the Plaintiff did not sufficiently plead that his public statements were materially false nor that he acted with the requisite scienter.[4] The Court will address each argument in turn.

A.    Linden's Public Statements

Linden made many public statements during the Class Period that the plaintiffs allege were false and misleading. (CAC ¶¶ 95, 99, 103, 107, 111, 115, 119, 127, 131, 136, 141,

---

[3] *See, e.g., SEC v. Koenig*, 2007 WL 1074901, at *4 (N.D. Ill. Apr. 5, 2007) ("A GAAP violation is presumptively a false or misleading statement of material fact under Rule 10b-5.")

[4] Linden also made two requests for judicial notice. First, in support of its initial brief, Linden requested that the Court take judicial notice of certain press releases, documents filed with the SEC, and certain public reports of the prices of Merge common stock that are relied upon in the CAC. The Court will grant Linden's request in that regard.

Linden also requested that the Court take judicial notice of additional filings it made with the SEC that were not referenced in the CAC and were filed only to support his reply brief. The Court will reject that request. The Court may only consider evidence that is referenced in the CAC, and a reply brief may only reply to the arguments made in the plaintiff's response brief. Linden may not make new arguments in its reply brief based on new evidence its submits. Accordingly, the Court will reject Linden's second request for judicial notice.

11

145, 153, 157.) In these statements, Linden made optimistic projections for the future of Merge on the basis of its past strong financial performance. For example, after releasing its 2002 financial results, Linden commented, "We will maintain the operational and financial discipline that has contributed to our positive financial performance in 2002 . . . ." (*Id*. at ¶ 107.) Or, in another instance, after Merge released its results from the second quarter of 2003, Linden stated, "Our performance continues to demonstrate the market's acceptance of our product and service offering and our ability to successfully execute our strategy." (*Id*. at ¶ 115.)

While statements containing simple economic projections, statements of optimism, and other types of "puffery" are insufficient to be actionable, defendants may be liable for misrepresentations of existing facts. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). The statements attributed to Linden in the CAC did more than just offer optimistic projections; he based those projections on Merge's current "positive financial performance," even though its strong performance was later reported to be substantially overstated due to accounting errors. *See id*. Accordingly, the plaintiffs sufficiently pled that Linden's public comments were materially false.

B.    Scienter

Linden also argues that the plaintiffs did not sufficiently plead scienter. Scienter is an intent to deceive, demonstrated by knowledge of the statement's falsity, or reckless disregard of the statement's falsity, or reckless disregard of a substantial risk that the

12

statement is false. *See Higginbotham v. Baxter*, 495 F.3d 753, 756 (7th Cir. 2007). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2). A "strong inference" means that the plaintiff "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 127 S.Ct. at 2513 (emphasis in original). In addition, courts must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S.Ct. at 2509 (emphasis in original).

The facts pled in the CAC, considered collectively, creates a strong inference that Linden acted with scienter. Merge's Restatement admitted that "certain former members of senior management did not set a proper ethical tone . . . [and] were directly involved in circumventing our accounting controls, and other former members of our management were aware, or should have been aware, that such controls were being circumvented." (CAC ¶ 89.) While Merge did not specifically name "the certain former members of our management," there is a strong inference that Linden, the former CEO, was one of those members. Linden resigned when the accounting deficiencies were made public, and Merge highlighted that his resignation was part of Merge's remediation plan. (*Id.* at ¶¶ 176, 184); *see In re Scottish Re Group Sec. Litig.*, 2007 WL 3256660, at * 15 n. 176 (S.D. N.Y. Nov. 2, 2007) (resignations "add to the overall pleading of circumstantial evidence of fraud."). In addition, the Restatement admits that there was a nexus between senior management's

13

circumventing accounting controls and the material misstatements. It stated that "[t]his deficiency contributed to material misstatements in our interim consolidated financial statements . . . ." (CAC ¶ 89.)

Another factor contributing to a strong inference of scienter is the magnitude of the accounting errors. Merge's income was overstated by more than 30% in 2002, more than 40% in 2003, and more than 240% in 2004. (*Id.* at ¶¶ 92-93.) The magnitude of those misstatements further supports a strong inference that Linden knew, or at least should have known, of the accounting deficiencies that allegedly created such a massive overstatement of income. *See Takara Trust v. Molex, Inc.*, 429 F. Supp. 2d 960, 980 (N.D. Ill. 2006) ("GAAP violations may support the inference depending on: the magnitude of the accounting error, a defendant's prior notice of the error, or a defendant's responsibility for calculating and disseminating financial information.")

Finally, the CAC relies on the claims of twenty-one confidential witnesses, many of whom allege Linden's direct involvement in the circumvention of Merge's accounting controls. For example, CW 2, the former Vice President of Direct Sales, alleged that Linden would personally negotiate side agreements with customers and continue to recognize revenue as if the side agreements did not exist. (CAC ¶¶ 60-61.) Another example is the allegation of CW 20, who was a shipping and receiving clerk. He learned that Merge shipped a customer a used print server rather than the products that it ordered. When CW20 inquired why Merge sent its customer a used print server, he discovered that Linden

14

apparently directed an employee to "ship whatever they had in stock" so as "to make their numbers." (*Id*. at ¶ 76.)

While allegations from confidential witnesses must be "discounted," they should not be "ignored." *See Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). That is to say, statements from anonymous sources may "corroborate or disambiguate evidence from disclosed sources." *Id*. The confidential witnesses' statements do precisely that – they corroborate and explain in greater detail than the Restatement how Linden allegedly circumvented its accounting controls.

When considered collectively, these alleged facts give rise to a strong inference that Linden acted with scienter. Furthermore, because Linden was acting within the scope of his position as CEO, his alleged scienter can be imputed to Merge. *See Makor*, 437 F.3d at 603.

III.  Scott Veech

Scott Veech served as Merge's CFO during the relevant time period. He also argues that the CAC did not sufficiently allege scienter to survive a motion to dismiss. Veech is wrong. Many of the same alleged facts that create a strong inference that Linden acted with scienter also apply to Veech. The Restatement specifically blames "certain former members of senior management" for failing to set a "proper ethical tone" and being "directly involved in circumventing our accounting controls." (CAC ¶ 89.) As the CFO, Veech was responsible for establishing and maintaining those controls. The 2002, 2003, and 2004 Forms 10-K specifically stated that, "[o]ur Chief Executive Officer [Linden] and Chief

15

Financial Officer [Veech] . . . are responsible for establishing and maintaining adequate control over financial reporting." (*Id*. at ¶ 205.) Also, after the Board of Directors conducted its internal investigation, the Audit Committee cited Veech's resignation as part of its remediation plan. (*Id*. at ¶ 184.) The magnitude of the accounting errors, for which Veech was directly responsible, likewise infers the possibility of scienter. And finally, while there were not as many statements from confidential witnesses regarding Veech's activity as there were with regard to Linden, CW 2, the former Vice President of Direct Sales, alleges that Veech would sometimes negotiate side agreements with customers and continue to recognize revenue as if the side agreements did not exist. (*Id*. at ¶ 61.)

Each of these allegations, by themselves, would not give rise to a strong inference of scienter. Considered collectively, though, they create a strong inference that Veech acted with scienter, rather than acting innocently or carelessly. Accordingly, the allegations against Veech likewise survive the pleading stage.

IV.    <u>David Noshay</u>

The CAC does not make sufficient allegations against Noshay to create a strong inference that he acted with scienter, let alone that he made any false, material statements. Noshay served as Merge's Senior Vice President of Strategic Development during the relevant time period. However, unlike Linden and Veech, there is no allegation that Noshay participated in the creation of Merge's financial statements or that he signed any financial statements or that he was responsible for maintaining adequate control over financial

16

reporting. The CAC only generally avers that Noshay was "intimately involved in the actual sales process" and "directly involved in revenue recognition" with Linden and Veech. (CAC ¶¶ 55, 59.) Yet, none of the confidential witnesses specifically allege that Noshay circumvented Merge's accounting controls. When pleading fraud, general allegations are not sufficient. The plaintiff must plead the circumstances constituting the fraud with particularity, that is to say, "the who, what, where, when, and how." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

The CAC alleges two specific instances of Noshay making alleged materially false statements, but they are not sufficient. On January 24, 2006, Noshay commented,

> Our users have a continual need to learn new ways to accelerate productivity, grow their revenues and expand their reach and services to referring physicians. The user group meeting provides an opportunity for radiologists, imaging center managers, PACS and RIS administrators, radiology managers, IT staff, billing managers and others to learn new ways to improve workflow, speed productivity and improve profitability within their organizations.
>
> (CAC ¶ 162.)

The Plaintiff avers that this statement was false because the group meeting was actually designed to allow for customers to express their complaints, not learn new ways to improve work efficiency. (*Id*. at ¶ 163.) Also, on February 8, 2006, Noshay allegedly represented,

> Our customers' business needs are driving the evolution of a new age of medical imaging. The Referring Practice Portal is aligned with those business needs, along with the comprehensive solutions that bring together RIS, PACS, clinical applications and solid expertise in integration.
>
> (*Id*. at ¶ 164.)

17

Noshay's statement was false according to the Plaintiff because Merge did not, in fact, have "expertise" in integration. (*Id*. at ¶ 165.)

These statements, unlike the public statements of Linden and the financial reports for which Linden and Veech were allegedly responsible, are not related to the accounting and revenue recognition deficiencies that are at the heart of the Plaintiff's case. The CAC does not state with particularity why the statements were misleading or whether investors relied upon these statements when making investment decisions. Accordingly, these statements do not sufficiently allege a fraud claim against Noshay either.

The Plaintiff also argues that the CAC creates "control person" liability over Noshay pursuant to § 20(a) of the Exchange Act. To establish control person liability, a plaintiff must allege (1) a primary violation of the federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. 15 U.S.C. § 78t(a). While the CAC properly alleges a violation of the federal securities laws, it does not aver that Noshay had primary control over the violators. According to the CAC, Noshay never executed a single sales contract; he merely finalized them for his superiors to execute. (CAC ¶ 55.) The CAC does not make any specific allegations that Noshay entered into any side agreements or controlled those who did. There is no allegation that Noshay had the ability to control any of the publicly-filed earnings statements that are the subject of the CAC, nor that he had to verify their accuracy. In short, the CAC does not sufficiently allege that Noshay made any materially false statements or that he had control over those who did.

18

And, even if he did make such statements, the CAC does not create a strong inference that he acted with scienter. While Noshay resigned when the reports of the misstatements were made public, and his resignation was sited as part of the remediation plan of the Audit Committee, that is not enough by itself to strongly infer scienter. *See Comms. Workers of Am. v. CSK Auto Corp.*, 2007 WL 951968, at * 6 (D. Ariz. 2007) ("Neither a resignation nor a termination *by itself* gives rise to a strong inference of scienter.") (emphasis added). Of the twenty-one confidential witnesses, four of whom allegedly reported to Noshay, none of them made any specific allegations against Noshay. There is no evidence, in addition to his resignation, that corroborates a possible inference of scienter. That omission further requires the Court to grant Noshay's motion to dismiss.

V. <u>KPMG</u>

KPMG was the independent auditor of Merge during the Class Period. It made materially false statements when its issued its audit reports for fiscal years 2002, 2003, and 2004, and a false internal controls report for 2004. These reports inaccurately stated that Merge's financial statements were "in conformity with accounting principles generally accepted in the United States of America" and that Merge had "effective internal controls over financial reporting." (CAC ¶¶ 257-260.) The Restatement later admitted that KPMG's statements were false.

Nevertheless, the claims against KPMG cannot survive because the allegations in the CAC do not raise a strong inference of scienter. The CAC merely identifies the applicable

19

accounting and auditing standards and alleges that KPMG violated them. Alleged violations of GAAP, without more, does not create a strong inference of scienter. *See Great Neck Capital Appreciation Invest. Partnership v. PricewaterhouseCoopers LLP*, 137 F. Supp. 2d 1114, 1124 (E.D. Wis. 2001) ("A failure to follow GAAP without more does not necessarily amount to fraud.")

The Seventh Circuit's decision in *Robin v. Arthur Young & Co.* – a decision issued under the more lenient standard of Rule 9(b) of the Federal Rules of Civil Procedure – is controlling. 915 F.2d 1120 (7th Cir. 1990). In *Robin*, the plaintiff's complaint alleging securities fraud against an audit firm contained no specific factual allegations showing how the auditors would know of the errors in the financial statements. The Seventh Circuit affirmed the dismissal of the complaint. *Id*. at 1127. The court explained that "bare allegations that [the auditor] should have known or that its knowledge was due to a reckless disregard of the truth are not sufficient to turn a possible negligence or malpractice action into an action for securities fraud." *Id*. The CAC at issue in the instant action likewise makes no additional allegations than those made in *Robin*, so the Court must dismiss the securities fraud claims against KPMG.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

KPMG's Motion to Dismiss (Docket No. 64) is **GRANTED**. KPMG is **DISMISSED** as a defendant in this case, without prejudice.

20

Veech's Motion to Dismiss (Docket No. 67) is **DENIED**.

Noshay's Motion to Dismiss (Docket No. 70) is **GRANTED**. Noshay is **DISMISSED** as a defendant in this case, without prejudice.

Linden's Motion to Dismiss (Docket No. 73) is **DENIED**.

Linden's First Request for Judicial Notice (Docket No. 75) is **GRANTED**.

Merge's Motion to Dismiss (Docket No. 78) is **DENIED**.

Linden's Second Request for Judicial Notice (Docket No. 106) is **DENIED**.

Dated at Milwaukee, Wisconsin this 31st day of March, 2008.

**BY THE COURT**

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**

21